1  G. WHITNEY LEIGH (SBN 153457)
   LAW OFFICES OF WHITNEY LEIGH
2  One Sansome Street, 35th Floor
   San Francisco, CA  94104
3  Telephone:  (415) 345-9500
   Facsimile:  (415) 345-9501
4

5  Attorney for Plaintiff
   CHRISTOPHER SMITH
6

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10 CHRISTOPHER SMITH,                    Case No.

11                    Plaintiffs,        **_VERIFIED_ COMPLAINT FOR
                                         DECLARATORY AND INJUNCTIVE
12 v.                                    RELIEF AND DAMAGES FROM
                                         RACKETEERING, CONSPIRACY TO
13 CITY OF BERKELEY, CITY OF             ENGAGE IN A PATTERN OF
   BERKELEY MEDICAL CANNABIS             RACKATEERING ACTIVITY**
14 COMMISSION, THE BERKELEY CITY
   COUNCIL, its various employees,       **18 U.S.C. § 1961 et seq.;
15 BERKELEY PATIENTS GROUP,              18 U.S.C.1964 (Civil Rico Remedies)**
   BERKELEY PATIENTS CARE
16 COLLECTIVE, dba for COMMUNITY         **<u>DEMAND FOR JURY TRIAL</u>**
   FLAVOR LLC, CANNABIS BUYERS
17 CLUB OF BERKELEY and DOES 1 to 20,
   inclusive,
18

19                    Defendants.

20

21

22

23

24

25

26

27

28

---

**_VERIFIED_ COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1    Plaintiff CHRISTOPHER SMITH, (hereinafter "Plaintiff") brings this Complaint against

2  Defendants CITY OF BERKELEY, CITY BERKELEY MEDICAL CANNABIS COMMISSION,

3  THE BERKELEY CITY COUNCIL, its various employees, BERKELEY PATIENTS GROUP,

4  BERKELEY PATIENTS CARE COLLECTIVE, dba for COMMUNITY FLAVOR LLC,

5  CANNABIS BUYERS CLUB OF BERKELEY and DOES 1-20 (individually and/or collectively

6  referred to as "Defendants") and allege as follows:

7                              **INTRODUCTION**

8    California prohibits medical marijuana organizations from operating on a for-profit basis.

9  Every City and County in the State has complied with this law, except one: the City of Berkeley. In

10  Berkeley, the government has not only allowed for-profit entities to operate, it has allowed them to

11  monopolize the delivery of marijuana to cannabis patients, reaping millions from patients over-

12  charged to line the pockets of the unlawful organizations' owners.  In the process, these entities have

13  committed and facilitated the commission of repeated, felony violations of the California Penal

14  Code.

15    In this action, Plaintiffs, medical cannabis patients residing in Berkeley seek court relief to

16  end the City of Berkeley's flagrantly unlawful actions to establish and enable the unlawful

17  monopolization of the sale of medical marijuana in Berkeley by a few individuals operating in

18  blatant violation of California law.  Although California law prohibits medical marijuana

19  organizations from operating on a for-profit basis, the government of the City has knowingly

20  allowed for-profit organizations to operate as the "authorized dispensaries" exclusively allowed to

21  sell marijuana to cannabis patients who need the medicine, and to grossly inflate the prices of this

22  medicine to line the pockets of these organizations' owners.  Worse, the City has not only ignored or

23  blocked efforts of the public to bring light to the unlawful acts of these organizations – it has placed

24  representatives of these organizations in key government positions, from which these organizations

25  have been able to steer Berkeley's medical cannabis law to shield the unlawful organizations from

26  compliance with California law.

27    Daniel Rush, a sitting member of the City's Medical Cannabis Commission, has already

28  been indicted for taking $600,000 in "loans" from dispensaries.

---

1

***VERIFIED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Berkeley's medical cannabis patients have suffered greatly from the City's actions, which have forced patients to pay more than twice the price for medical cannabis that lawful, non-profit organizations would charge.  This has allowed a handful of individuals to reap tens of millions at the expense of medical cannabis patients in Berkeley victimized by the illegal for-profit cannabis monopoly in Berkeley.  No other City of County in California has sanctioned this kind of brazen and unbelievably, the City has joined with the unlawful organizations to prevent lawful nonprofit cannabis organizations from serving medical cannabis patients in Berkeley. Because the government of the City of Berkeley, including the City Attorney of Berkeley in particular, is complicit in the unlawful monopolization of the dispense of medical marijuana by these for-profit organizations, Plaintiffs have no recourse but to seek relief from the Court.

## JURISDICTION AND VENUE

1.      This Court has subject jurisdiction pursuant to the civil RICO remedies at subject matter jurisdiction over RICO claims pursuant to 28 U.S.C.A. § 1331 and 18 U.S.C.A. § 1964(c). This Court has personal jurisdiction over the Defendants under 18 U.S.C.A. § 1965(b) because jurisdiction is required by the ends of justice.  This Court has personal jurisdiction over the Defendants under 18 U.S.C.A. § 1965(d) because each Defendant has engaged in transactions in this judicial district in furtherance of the criminal enterprise that is the subject of this lawsuit.

2.      Venue is proper because the acts complained of occurred or originated in the County of Alameda, California, in the Northern District of California.

## PARTIES

3.      Plaintiff CHRISTOPHER SMITH is an individual tenant of Units 1-3 and 11 on the second story of the premises located at 1820-1828 San Pablo Avenue, Berkeley, California, and 1510 Ashby, Berkeley California.

4.      Defendant CITY OF BERKELEY (the "CITY") is, and was at all relevant times, a municipal corporation existing under the laws of the State of California.

5.      Defendant CITY OF BERKELEY MEDICAL CANNABIS COMMISSION is a subdivision or commission organized under the City of Berkeley which was established under the authority of Berkeley Municipal Code Section 12.26.110, and is charged with ensuring that the

*VERIFIED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  provision of medical cannabis in the City of Berkeley is conducted in a safe and orderly manner to
2  protect the welfare of qualified patients and the community.

3      6.      Defendant CITY OF BERKELEY CITY COUNCIL is the governing body of the
4  municipality of the City of Berkeley, established pursuant to Article VIII of the Berkeley City
5  Charter. The City Council is comprised of eight (8) members representing each of Berkeley's eight
6  districts, and is charged with exercising the corporate powers of the City, and, subject to the express
7  limitations of this Charter, is vested with all powers of legislation in municipal affairs adequate to a
8  complete system of local government consistent with the Constitution of the State. The Mayor of the
9  City of Berkeley is a voting member of the City Council.

10     7.      Defendant BERKELEY PATIENTS GROUP is a for-profit corporation organized in
11 California.

12     8.      Defendant BERKELEY PATIENTS CARE COLLECTIVE, dba for COMMUNITY
13 FLAVOR LLC, is a for-profit corporation organized in California.

14     9.      Defendant CANNABIS BUYERS CLUB OF BERKELEY is organized as a
15 California cooperative corporation. On information and believe, CANNABIS BUYERS CLUB OF
16 BERKELEY is a for-profit organization.

17                          **OVERVIEW OF CROSS-COMPLAINT**

18     10.     This case involves an on-going criminal enterprise – the for-profit sale and
19 distribution of Cannabis.  Plaintiff alleges that three entities – Berkeley Patients Group, Berkeley
20 Patients Care Collective, and Cannabis Buyers Club of Berkeley, have for years unlawfully operated
21 huge illegal cannabis operations in the City of Berkeley.  Because California law prohibits the
22 operation of for-profit cannabis operations, and because each of these organizations operated on a
23 for-profit basis, each act of sale or distribution of cannabis by these entities constitutes a violation of
24 criminal provisions of  California's Penal Code (California Health and Safety Code § 11357, et seq.

25     11.     These organizations have monopolized access to medical cannabis in Berkeley, by
26 acting as the so-called "approved dispensaries" allowed under a 3-dispensary cap imposed by the
27 City of Berkeley.

28

12.     The City of Berkeley and its subdivisions, include the Office of the City Attorney of Berkeley, have jointly worked with the illegal, for-profit dispensaries to allow the illegal sale of marijuana for profit and to facilitate the monopolization of the delivery of medical cannabis to patients in Berkeley by these entities. The City's acts in concert with the criminal enterprise include:

   a.  Attempting the *sub silentio* "approval" of these for-profit dispensaries, and thereby to:  (1) avoid any compliance with due process or the City Charter in the selection of the "approved dispensaries", and to (2) evade disclosure of the entities' for-profit status;

   b.  The placement of representatives of the illegal representatives as the sole members of a City body charged with supervising the dispensaries – in direct violation of a measure passed by the people of Berkeley requiring a supervising entity comprised of an ecumenical membership including *legal*, *non-profit* marijuana organizations;

   c.  The passage of local ordinances that purported to exempt the illegal for-profit dispensaries from regulations requiring marijuana organizations to operate on a not-for profit basis; and

   d.  The targeting of legal, non-profit marijuana organizations with litigation and nuisance abatement actions, in order to prevent legal operations – which would charge fair, non-profit prices to Berkeley cannabis patients – from undercutting the profits of the illegal dispensaries.

13.     In this action, Plaintiffs, medical cannabis patients residing in Berkeley seek court relief to end the City of Berkeley's flagrantly unlawful actions to establish and enable the unlawful monopolization of the sale of medical marijuana in Berkeley by a few individuals operating in blatant violation of California law.  Although California law prohibits medical marijuana organizations from operating on a for-profit basis, the government of the City has knowingly allowed for-profit organizations to operate as the "authorized dispensaries" exclusively allowed to sell marijuana to cannabis patients who need the medicine, and to grossly inflate the prices of this medicine to line the pockets of these organizations' owners.  Worse, the City has not only ignored or blocked efforts of the public to bring light to the unlawful acts of these organizations – it has placed representatives of these organizations in key government positions, from which these organizations have been able to steer Berkeley's medical cannabis law to shield the unlawful organizations from compliance with California law.  Thus City has further facilitated the illegal for-profit enterprise by promulgating and supporting the promulgation of evasive, "weasel-word" statements designed to

*VERIFIED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  defraud Plaintiff and the public into believing that these entities operated as non-profits, and to

2  conceal the entities illegal, for-profit operation.

3       14.     Berkeley's medical cannabis patients have suffered greatly from the City's actions,

4  which have forced patients to pay more than twice the price for medical cannabis that lawful, non-

5  profit organizations would charge.  This has allowed a handful of individuals to reap tens of millions

6  at the expense of medical cannabis patients in Berkeley victimized by the illegal for-profit cannabis

7  monopoly in Berkeley.  No other City of County in California has sanctioned this kind of brazen

8  And unbelievably, the City has joined with the unlawful organizations to prevent lawful nonprofit

9  cannabis organizations from serving medical cannabis patients in Berkeley.  Because the

10 government of the City of Berkeley, including the City Attorney of Berkeley in particular, is

11 complicit in the unlawful monopolization of the dispense of medical marijuana by these for-profit

12 organizations, Plaintiffs have no recourse but to seek relief from the Court.

13 **STANDING TO SUE FOR INJURIES PROXIMATELY CAUSED BY DEFENDANTS**

14       15.     Plaintiff's standing to bring civil-RICO claims will be established by Plaintiff

15 showing a pattern of violation of 18 USC §1962 by Defendants, with such violations directly

16 causing injury to Plaintiff's business or property and the public, which Plaintiff alleges here and sets

17 forth with the required specificity herein under each separate count.

18       16.     Plaintiff has suffered a pecuniary interest as a result of Defendants' actions,

19 including:

20       a.   The loss of his legal, non-profit organization, which was shut down after being
21            targeted by Defendants with publicity campaigns, abatement actions and litigation;

22       b.   The loss of good will and reputation, as a result of being targeted as an "illegal
             dispensary" -- the illegality stemming from the City's false claim that the 3 illegal
23            for-profit dispensaries had filled the City's 3- dispensary cap;

24       c.   Attorney's fees and costs, incurred in lawsuits brought against Plaintiff by the City on
25            behalf of and in concert with the intents and desires of the illegal for-profit
             dispensaries; and

26       d.   The loss of the right to honest services from the employees and officials of the City
27            of Berkeley; and

28       e.   The loss of employment and employment opportunities.

*VERIFIED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

17.     Defendants proximately caused these injuries through the acts in furtherance of the criminal enterprise, as described more fully below.  Defendants acts, in scheming to occupy the City's 3-dispensary cap, in targeting Plaintiff with litigation and abatement actions, and in investing their ill-gotten gains for these purposes, has directly harmed Plaintiff.

**CIVIL RICO ENTERPRISE PATTERN**

18.     Defendants have violated the provisions 18 USC §1962(c) by conducting or participating, directly or indirectly, in the conduct of the affairs of an enterprise or enterprises, through a pattern of racketeering activity, as further set forth with the required specificity under each separate count.

19.     Defendants' pattern of racketeering activity has continued and escalated for more than 4 years, and continues through the present day.

20.     The pattern of Defendants' violation of 18 USC §1962(c) has caused injury in the business and property of Plaintiff as contemplated by 18 USC §1964(c), as further set forth with the required specificity under each separate count.

**STATEMENT OF FACTS**

*Governing Law*

21.     In 1996, California voters passed Proposition 215, known as the "Compassionate Use Act," concerning the use of medical cannabis. Proposition 215 added Section 11362.5 *et seq.* to the California Health and Safety Code.

22.     Among the protections afforded by the Compassionate Use Act are exemptions from criminal liability for so-called "primary caregivers" who receives "payment for out-of-pocket expense" incurred in providing services to "eligible qualified patients" that allow that patient to use marijuana.

23.     In 2003 the Legislature enacted the MMPA, effective January 1, 2004, adding sections 11362.5 through 11362.83 to the Health and Safety Code. The express intent of the Legislature was to: "(1) Clarify the scope of  [1008]  the application of the [CUA] and facilitate the prompt identification of qualified patients and their designated primary caregivers in order to avoid unnecessary arrest and prosecution of these individuals and provide needed guidance to law

enforcement officers. (2) Promote uniform and consistent application of the [CUA] among the counties within the state. [(3) Enhance the access of patients and caregivers to medical marijuana through collective, cooperative cultivation projects.

24.     The MMPA also specifies, at section 11362.765, subd. (a) that collectives, cooperatives or other groups shall not profit from the sale of marijuana. (§ 11362.765, subd. (a).  On August 25, 2008, the California Attorney General issued "Guidelines for the Security and Non-Diversion of Marijuana Grown for Medical Use". The A.G. Guidelines' stated purpose is to:  "(1) ensure that marijuana grown for medical purposes remains secure and does not find its way to non-patients or illicit markets, (2) help law enforcement agencies perform their duties effectively and in accordance with California law, and (3) help patients and primary caregivers understand how they may cultivate, transport, possess, and use medical marijuana under California law."

25.     The A.G. Guidelines affirm that to be lawful, a marijuana organization or entity must be a non-profit operation.

### *Berkeley Ordinances*

### The City of Berkeley's "Lowest Priority" Initiative of 1979

26.     In 1979, Berkeley voters passed the Berkeley Marijuana Initiative, an ordinance that made the possession, cultivation, sale and transportation of marijuana the police department's lowest priority, and to express the City's support for the legalization and decriminalization of marijuana. Also known as the "Lowest Priority Initiative", the ordinance added Chapter 12.24 to Berkeley Municipal Code, and expressed the City's support for the legalization and decriminalization of marijuana.

### Berkeley's 2001 Medical Cannabis Protocol Ordinance

27.     In 2001, the City Council passed Chapter 12.26 of the Municipal Code, "Protocols for Medical Cannabis" (the "2001 Ordinance"), intended to implement California Health and Safety Code Section 11362.6, known as the "Compassionate Use Act" of 1996. The 2001 Ordinance established certain rights for "Medical Cannabis Collectives", which it defined as follows:

> "Medical cannabis collective" shall mean a cooperative, affiliation, association, or collective of persons comprised exclusively and entirely of qualified patients and the primary caregivers of those patients, the purpose of which is to provide

education, referral or network services to qualified patients, and to facilitate or assist in the cultivation and manufacture of medical cannabis for qualified patients.

*See* Ord. 6620-NS § 1, 2001 (Section 12.16.101D).

28. In September 2004, the City Council passed an ordinance, the "2004 Protocol Ordinance", amending Chapter 12.26 of the Berkeley Municipal Code to add a new defined term, "Medical cannabis dispensary", a term previously unrecognized in state or Berkeley law. Under the ordinance, "medical cannabis dispensary" was defined as "any person or entity that dispenses, cultivates, stores or uses medical cannabis except where such use is by a patient or the patient's caregiver, incidental to residential use by such patient, and for the sole use of the patient who resides there.*"*

29. The ordinance also established a cap of three on medical dispensaries, in addition to geographic limitations on where those dispensaries could be located:

No more than three medical cannabis dispensaries shall be located within the limits of the City of Berkeley. No such dispensary shall be located within a 1000 foot range of another such dispensary, nor within 1000 feet of a public elementary, middle or high school. Any dispensary existing at the time this ordinance becomes effective may continue at its current location notwithstanding its violation of the de-concentration requirements of this section. The City Manager may issue regulations to implement this section.

30. Although the 2004 Protocol Ordinance established a three-dispensary cap, the City Council did not designate any "existing" dispensaries or establish any criteria for selecting or qualifying the three dispensaries (which the statute broadly defined to include all persons who used or dispensed cannabis except for patients or patient caregivers doing so incidental to residential use and for the sole use of the patient).

31. Although the 2004 ordinance authorized the City Manager to issue regulations to implement the statute, it provided no guidelines instructing the City Manager as to how the three dispensaries should be selected.

32. The failure to provide such guidelines precluded the City Manager from lawfully selecting the three dispensaries to be allowed under the cap.

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

33.    In any case, the City Manager never issued any regulations establishing criteria for the selection of the three dispensaries, or ever established any process for the selection. Neither the City Council, the City Manager, nor any other authorized entity ever designated the three dispensaries through any legal process or procedure.

34.    The City has effectively conceded that none of the so-called "authorized dispensaries" was ever legally authorized. In *Smith v. City of Berkeley*, litigation pending before the Superior Court of California (case No. RG15767085) Mr. Smith and other plaintiffs asserted, inter alia, that: (1) the Berkeley City Council's failure to establish any criteria, pursuant to which the determination of authorized dispensaries could be lawfully made by the City Manager; (2) the City Manager's failure to establish any regulations or process for the selection of the authorized dispensaries; (3) the City Manager's consequent inability to select the authorized dispensaries; and (4) the City Manager's failure in any case to do so, in support of claims brought under California's nuisance and unfair competition laws.

35.    The City demurred to the complaint, and in so doing, effectively conceded that no lawful designation of any of the so-called "authorized" dispensaries ever occurred. The City contended that

> The City shortly thereafter [i.e. after Measure JJ passed in 2008) made an explicit determination as to the three dispensaries in existence in 2004 when the cap was adopted, in order to determine the composition of the Peer review committee [established by Measure JJ]". *See* Defendants' MPA ISO Demurrer (dated May 20, 2015) at page 3.

36.    But the only support the City cited for this contention was a December 17, 2008 memorandum from then-acting City Attorney Zach Cowan and Deputy City Attorney Matthew Orebic to City Planning Director Dan Marks and Deputy Planning Director Wendy Cosin, for which the City requested Judicial Notice under Evidence Code section 453. *See id;* and Defendants' Request for Judicial Notice, Exhibit 2.

37.    In the memorandum, Mr. Cowan and Mr. Orebic assert that the City Planning staff informed them that BPG and Community Flavor were in continuous operation since 2004. Cowan and Orebic also assert that staff informed them that they met with CBCG representatives, who in turn told the City staff that: (1) had operated at 3124 Shattuck Street from prior to 2004 to 2007; (2)

in 2007 CBCB had switched to a delivery service and (3) as of the date Measure JJ passed, CBCB was still delivering medical marijuana to approximately 14 patients.

38. This memorandum could not establish the City's lawful determination of the three dispensaries "in existence" in 2004 for multiple reasons.

39. First, as of the date of the Cowan/Orebic memorandum, the City's definition of dispensary remained as it was in 2004: (*i.e.*, "any person or entity that dispenses, cultivates, stores or uses medical cannabis except where such use is by a patient or the patient's caregiver, incidental to residential use by such patient, and for the sole use of the patient who resides there.*"*).  Under this definition, the number of dispensaries that had been in continuous existence in Berkeley from 2004 to 2008 numbered in the hundreds at the least.

40. Such dispensaries included Christopher Smith's residence at 1280-1288 San Pablo Avenue and 1510 Ashby Avenue.

41. Prior to 2004 and continuing through 2008, Christopher Smith was a person who dispensed, cultivated, stored and or used  medical marijuana at 1280-1280 San Pablo Avenue and at 1510 Ashby that was not his sole use, or the sole use of anyone who resided with him at that location.

42. But neither the City Attorney nor City staff made any attempt to contact Mr. Smith, or any other member of the Berkeley public regarding their qualification as a dispensary, other than BPC, Community Flavor, and CBCB.

43. Unlike the owners of these three entities, Mr. Smith is not white.

44. Second, neither the City Attorney, nor the City staff, had the authority to select the dispensaries.

45. The City Council is the governing body of the City of Berkeley. City Charter, Art. VII, §38.  The Council may act only by ordinance resolution or motion. City Charter, Art. VII, §44. But the Council passed no ordinance authorizing the City Attorney or Planning staff to select the City's three "authorized dispensaries."

46. The City Charter also provides for the appointment by the Council of a City Manager, responsible for the implementation of Council policy. City Charter, Art. VII, §§27-28.

47.     But the City Manager cannot perform duties conferred upon the Council by the State legislature or City Charter.  *See San Francisco Fire Fighters v. San Francisco*, 68 Cal. App. 3d 896, 903 (1977).   The awarding of the right to operate a medical marijuana is one such non-delegable duty.

48.     The right to operate a medical marijuana dispensary under Berkeley's 3-dispensary cap is a "franchise", that is, a "a special privilege conferred by government upon an individual or corporation, and which does not belong to the citizens of the country generally, of common right."

49.     Berkeley's Charter expressly devolves the discretionary power to award a franchise to the City Council alone, and specifies procedures the Council must adhere to in granting such franchises. City Charter, Art. XII. The  Charter provides that:

    a.    The  Council is empowered to grant *by ordinance* a franchise to any person or entity to furnish the city and its inhabitants with a service; and

    b.    In granting a franchise, the Council must prescribe the terms and conditions under which the franchise will be granted, which must include provisions for:  (1) the giving of notice of franchise applications, (2) for protests against the granting of such franchises and (3) for public hearings on such application.  City Charter, Art. XII, §76.

50.     The City Council never passed an ordinance awarding the franchise to operate medical marijuana dispensaries to BPG, Community Flavor, or CBCB.

51.     Neither did the Council provide for any notice of applications, protests, or public hearings regarding any award of the right to operate as one of the three "authorized dispensaries".

52.     Even where a legislative authority may delegate authority, it may do so only where it first resolves fundamental policy issues and second establishes an effective mechanism to ensure that its policy decisions are implemented properly and non-arbitrarily. The failure to do so renders any exercise of said delegated authority unconstitutional and void.

53.     The 2004 Ordinance establishing the 3-dispensary gap directed the City Manager to implement the Ordinance, but provided no criteria for the determination of the 3 "authorized dispensaries", and provided no safeguards to protect against arbitrariness or favoritism in the award.

54.     Thus, even if the City Manager had determined the three "authorized dispensaries", such determination would constitute the unlawful and unconstitutional exercise of impermissibly-delegated legislative authority.

***The City Allows Three Illegal, For-profit Organizations to Monopolize
the Dispensation of Cannabis to Patients in Berkeley***

55.     But despite the lack of any legal designation or designation process for the dispensaries, the City has allowed three businesses to act as the three "authorized" dispensaries. These three businesses are Berkeley Patients Group ("BPG"), Berkeley Patients Care Collective ("BPPC"), and Cannabis Buyers Club of Berkeley ("CBCB").  None of these organizations was ever "authorized" under any legal procedure or process.

56.     Worse, none of these organizations could have been "authorized".  Each of these organizations has for years been run on a for-profit basis, in blatant violation of California law.

57.     BPG is a for-profit corporation and illegal under Health and Safety Code section 11362.

58.     BPG was a for-profit, illegal organization in 2004, when the City Council established the 3-dispensary cap. Because it was illegal at the time, BPG could not have qualified as one of the three dispensaries.

59.     BPG was a for-profit, illegal organization in 2008, when the Cowan/Orebic December 17, 2008 memorandum was issued.

60.     Berkeley Patients Care Collective is the dba for Community Flavor LLC.  BPCC is a for-profit corporation and illegal under Health and Safety Code section 11362.  The Secretary of State lists Community Flavor LLC's status as cancelled.

61.     BPCC was a for-profit, illegal organization in 2004, when the City Council established the 3-dispensary cap. Because it was illegal at the time, BPCC could not have qualified as one of the three dispensaries.

62.     BPCC was a for-profit, illegal organization in 2008, when the Cowan/Orebic December 17, 2008 memorandum was issued.

63.     Cannabis Buyers Club of Berkeley represents itself to be a cooperative corporation. California law requires that all cooperative corporations must organize, (Food & Agr. Code, § 54036; Corp. Code, § 12311, subd. (b)), and operate as nonprofit entities (Food & Agr. Code, § 54033; Corp. Code, § 12201). CBCB is not organized; the California Secretary of State indicates it has been a suspended corporation since May 5, 2008.  On information and belief, CBCB does not operate as a for-profit corporation, and it is illegal under Health and Safety Code section 11362.

64.     On information and belief, CBCB was a for-profit, illegal organization in 2004, when the City Council established the 3-dispensary cap. Because it was illegal at the time, CBCB could not have qualified as one of the three dispensaries.

65.     On information and belief, CBCB was a for-profit, illegal organization in 2008, when the Cowan/Orebic December 17, 2008 memorandum was issued.

***Berkeley City Officials Have Knowingly Allowed the Illegal Organizations to Operate, and have Assisted the Organizations in Evading Scrutiny***

66.     The illegal status of the three so-called "authorized dispensaries" is not news to Berkeley officials; they have known all along.  These officials have ***for years*** deliberately turned a blind eye to the dispensaries' illegal status, and have dodged and ignored requests from the public asking them to address the dispensaries' illegal status.  This has allowed the owners of these illegal for-profit dispensaries to reap millions overcharging medical cannabis patients in Berkeley.

67.     On June 10, 2010, a member of the public sent an email to the City Mayor, City Attorney Zack Cowan, and each of the members of the City Council, asking them to take action to address the illegal for-profit operation of Berkeley's dispensaries, and what he described as the "robber-baron like powers" the dispensaries were exercising in the absence of law enforcement by the city government.

68.     In the email, the member of the public stated that:

None of the medical cannabis dispensaries in Berkeley are operating nor structured lawfully under CA law. . . .

Berkeley Patient's Group is structured as a "C" class for profit corporation. It is owned by three parties and held via not publicly traded stock. One stock holder is the dominant principle. I believe the Patient's Care Collective is a LLC for profit style of corporation and has a single owner and finally CBCB is under a

13

mutual benefit corporate shell but in reality functions as a limited partnership of two individuals.

69. Mr. Cowan took no action in response to the email. Neither did any of the other City official recipients.

70. On June 14, 2010, the Patients Care Collective wrote in an email to Wendy Cosin, a City Planning Director responsible for medical marijuana regulation, in which he reprinted a letter he had sent to the City Mayor. In the email, he contends that a tax being contemplated by the City would make it "cost prohibitive for dispensaries *to become* nonprofit organizations, if and when they are able to under law." The email was authored by Erik Miller. Mr. Miller, on information and belief, is the sole owner of the "collective".

71. Both Mr. Cowan and the City have consistently maintained that in order for any use to be established as existing for the purposes of establishing use rights or pre-existing nonconforming use rights, such pre-existing use must have been lawful. On December 4, 2008 – 13 days before issuing the memorandum the City relies upon as its sole evidence that BPG, BPCC and CBCB were "authorized" as the three dispensaries, Mr. Cowan issued a memorandum to the City Council concerning a recently-passed initiative (the Patients Access to Medical Cannabis Act of 2008 ("Measure JJ")), in which he confirmed that under state law, for-profit medical marijuana collectives are illegal.

72. But in October 2009, the City Council passed a resolution designating Saturday, October 31, 2009 "Berkeley Patients Group Day". Within the resolution, the City expressly lauded BPG for having made progress towards certification as a b-corporation:

> WHEREAS, in Summer 2009, Berkeley Patients Group began the initial phase of becoming certified as an environmentally and socially conscious "B-corporation" scoring 133 on the initial assessment test; . . .

73. A b-corporation is a form of for-profit corporation recognized by California in 2012. In other words, **the City Council passed a 2009 resolution praising BPG for operating an illegal profit-making marijuana business**.

74. And profit it did. Records obtained by California Watch in 2012 revealed that in the same year the Berkeley Patients Group Day resolution issued, BPG registered more than $15 million in sales. $911,000 when to pay its three top executives. And although the City Council had lauded

14

BPG's generosity in giving back to the community through donations in its Berkeley Patients Group Day resolution, the records showed in 2009 only 18k went to charitable donations – BPG paid more than that for "ambiance".

75.     One reason for BPG's largess is that it has an extraordinary profit margin, which, on information and belief, BPG reported as 40 percent. In fact, BPG and the other unlawful dispensaries draw profits often *exceeding 300 percent.* And while the prices of cannabis has steadily dropped in the last five years, the unlawful dispensaries – enabled by the City's enforced unlawful monopolization—have *raised* the prices of cannabis sold to marijuana patients in Berkeley.

76.     BPG's profits were protected by the City, which placed BPG and the other illegal dispensaries in key positions to steer City marijuana-related ordinances in ways that favor the illegal dispensaries and occlude their for-profit status.

77.     The illegal dispensaries have invested the illegal proceeds of these profits in public campaigns to falsely promote themselves as legal non-profits and to influence legislation.

78.     On or around July 1, 2014, the Berkeley City Council adopted Resolution No. 66,711-N.S., "Adopting Ranking and Allocation Criteria and Procedure for Medical Cannabis Dispensaries." According to the resolution, there were "three operating Dispensaries", and one open slot" at the time of the City Council's approval of the resolution. The "three operating Dispensaries", each of which is illegal, were improperly excluded from the process.

79.     Resolution No. 66,711-N.S. outlines a four-round selection process. In the first round, "Application and Determination of Eligibility," applicants are subject to a background and criminal history check and a "Medical Cannabis competency test." According to the City's website, the "competency test" will "test [applicants'] knowledge of state and local medical cannabis regulations," including Chapters 12.26 and 12.27 of the Berkeley Municipal Code.

80.     The second round ranks applicants based on proposed location of business, business plan, neighborhood compatibility plan, and safety and security plan. The third round distributes points among applicants based on a variety of categories, including community benefits, "local enterprise," and qualifications of principals. In the fourth round, the City Council makes the "final decision" from among the top 5 remaining candidates.

81.     Critically, in the first round of the application, staff assesses applicants' "Business Plan" by mandating that applicants describe "mechanisms for ensuring that the Dispensary will operate on a Not-for-Profit basis."

82.     None of the previously "designated" three dispensaries were subject to any application process or competency test. Specifically, none of the designated three dispensaries were tasked with any demonstration of how they would operate on a Not-for-Profit basis.

83.     The application for the fourth dispensary requires applicants to attach proof of status, such as articles of incorporation, by laws, partnership agreements, and other documentation as may be appropriate or required by the City.

84.     None of the previously "designated" three dispensaries have ever provided this information. Instead, the City has deliberately not sought this information, knowing that if disclosed, such information would further demonstrate that these businesses are unlawful. Worse, the City has charged these organizations – through their representatives on the Medical Cannabis Commission – with the authority to select the new dispensary!

85.     In August 2014, the Council adopted Municipal Code Chapter 12.27, which require that a dispensary operate on a "Not-for Profit" manner.  **Incredibly, the Chapter expressly allowed the three so-called to continue to operate on a For-Profit basis for a year.  Thus, Chapter 12.27 purported to expressly grant the so-called "authorized dispensaries" the right to violate state law (Cal. Health and Safety Code Sections 11357, et. Seq.), by selling medical marijuana for [enormous] profit.** Section 12.27.010B provides:

> The three existing Dispensaries permitted as of January 1, 2012, under Berkeley Municipal Code section 12.26.130 shall have a grace period of 12 months from the effective date of this ordinance to comply with [Chapter 12.27]. Any such Dispensary that substantially complies with this ordinance by that time may continue to operate and shall not be required to participate in the ranking and allocation process under 12.27.100. Any such dispensary that does not substantially comply with this ordinance by that date shall cease operation, but may apply to operate under Berkeley Municipal Code section 12.27.100 on the same basis as any other applicant. (Ord. 7360-NS § 1 (part), 2014)

86.     Thus, Section 12.27.010B purports to grant a one year exemption from compliance with Chapter 27 to three "existing Dispensaries permitted as of January 1, 2012", under Code

Section 12.26.130.  But Section 12. 26.130 does not mention, much less identify any existing Dispensaries permitted as of January 1, 2012."  In relevant part, Section 12.26.130A provides merely that "Four medical cannabis dispensaries shall be allowed within the limits of the City of Berkeley, in locations and subject to the requirements specified in Title 23." And the only mention of a dispensary in Title 23 appears at Section 23E.16.070B, which provides that "A medical cannabis dispensary existing and authorized as of January 1, 2010, that does not comply with this Section, may continue at its current medical cannabis dispensing location and shall be considered a legal nonconforming use."  None of these provisions identify any existing and authorized dispensaries in 2010 or 2012.

87.    And none of the three dispensaries the City has sought to exempt from state law compliance based on their pre-existence ever were authorized, nor could they have been.  These illegal for-profit dispensaries were precluded from being "existing and authorized" dispensaries for the same reason they needed the exemption in the first place:  they were operating for profit, illegally.

88.    Nevertheless, Section 12.27.010B exempts the illegal for-profit dispensaries from compliance with Section 12.27.020G, which provides the City's definition of  "Not-For Profit", Sections 12.27.030B  and12.27.090B, which require dispensaries to operate on a Not-for-Profit basis, and Section12.27.040, which requires dispensaries to produce proof of their organizational status (such as such as articles of incorporation, by-laws, partnership agreements).

89.    And 12.27.010B exempts these same illegal for-profit dispensaries from the other provisions of Chapter 12.27, including, notably, competition to be a lawful city dispensary under the ranking and allocation process established pursuant to Section 12.27.100.

90.    The illegal for-profit dispensaries are also exempt from Section 12.27.030A, which prohibits persons convicted of certain crimes from holding positions with a dispensary.  These offenses include Health and Safety Code Sections 11357 (possession of marijuana, 11358 (cultivation or harvesting of marijuana), 11359 (possession for sale) and 11360 (transportation, sale, or furnishing of marijuana).  To the contrary, Section 12.27 purports to allow the illegal for-profit dispensaries to *commit each of these offenses*, by engaging in each of these activities for profit.

91.     Under Section 12.27, the illegal for-profit dispensaries also have a year-long exemption from compliance with the provisions requiring dispensaries to maintain and make available their financial records (including disclosure of salaries and monetary and nonmonetary distributions to members), and to disclose the wholesale prices the dispensaries pay for the marijuana they resell to patients. (B.M.C. 12.27.090; 12.27.020).

92.     Under Section 12.27,  marijuana organizations like that of Plaintiffs, which have operated and continue to operate lawfully as nonprofits, must comply with Section 12.27's provisions, and compete for a single "Fourth" dispensary, because three of the places allowed for dispensaries are occupied by three illegal for-profit dispensaries.

93.     While audacious, the City's treatment of the illegal for-profit dispensaries to the benefit of non-occurring, *ultra vires* authorizations and impermissible exemptions from state law is not entirely unpredictable. One reason for this is that representatives of these organizations held key positions on the committees and commissions where the ordinances originated.

94.     In, 2008, the City established a Medical Cannabis Commission and Peer Review Committee, charged with overseeing medical cannabis collectives and dispensaries pursuant to Measure JJ.  Although Measure JJ provided for the Peer Review Committee to be staffed by two representatives designated by the each of the medical cannabis collectives *and* dispensaries in operation at that time, the City chose to only seat representatives of the three illegal for-profit dispensaries, and not to seat representatives of the collectives.  Through the Peer Review Committee and its successor, the Medical Cannabis Commission, representatives of the illegal for-profit dispensaries have held positions allowing them to steer all of the City's subsequent changes and additions to its Marijuana ordinances – all of which originated in these bodies.

95.     The emergence of new ordinances laced with provisions exempting the three supposed "existing and authorized" dispensaries from complying with the new ordinances, or even with the State Penal Code – despite the fact that these dispensaries neither lawfully existed nor were authorized -- becomes more explainable (albeit still indefensible) once it is understood that the illegal for-profit dispensaries had a hand in drafting them.

96.     But the illegal for-profit dispensaries and their City-employee accomplices were not content just to draft and interpret City provisions to facilitate the for-profit dispensaries illegal monopoly.  They also joined to work in concert to prevent lawfully operating nonprofit organizations from surviving.   The for-profit dispensaries perceived the nonprofits, which charged substantially less for medical marijuana than the for-profit organizations, as a threat to their bottom line.

97.     Beginning in the late 2000s the illegal for-profit dispensaries began enlisting the Medical Cannabis Commission in an effort to force out the lawful nonprofits. Thus, representatives, including BPCC manager Erik Miller, complained to the Commission (effectively complaining to themselves) that the nonprofits (whom the City had refused to license) were not required to pay the taxes that they had to pay on their ill-gotten profits. And the Commission members agreed: as Commissioner Stewart Jones said, referring the illegal dispensaries, "It is really important that we watch out for the interests of those people who are abiding by what is asked of them by the City of Berkeley."

98.     Mr. Smith and the members of his lawful, non-profit collective in Berkeley, and medical cannabis patients, have suffered damages and irreparable harm as a result of the efforts by the City of Berkeley to enforce the monopoly of the unlawful "authorized dispensaries", to shut down their collective and other lawful collectives, and to charge them exorbitant prices to fee the profits of the unlawful dispensary owners.

99.     In June 2015, the City of Berkeley rejected Mr. Smith's applications for approval for a "Fourth Dispensary", based on the City's contention that Petitioner's selected locations were "already occupied" by the "approved dispensaries.

100.    The emergence of new ordinances laced with provisions exempting the three supposed "existing and authorized" dispensaries from complying with the new ordinances, or even with the State Penal Code – despite the fact that these dispensaries neither lawfully existed nor were authorized -- becomes more explainable (albeit still indefensible) once it is understood that the for-profit dispensaries had a hand in drafting them.

101.     Mr. Smith was given personal insight into how the City's Cannabis Commission worked.  In December 2013, then Medical Cannabis Commission Chair Daniel Rush's staff informed him that his collective would not receive support from the City unless he made kickback contributions to union entities connected to Rush. This was consistent with what Mr. Smith had come to understand based on several conversation, in which he was told that that 40 Acres would never get City support, because "[they] didn't pay the right people".

102.     In August 10, 2015 Commissioner Rush was indicted on federal criminal charges of taking bribes and rigging the union organizing process.   Rush, an organizer with the United Food and Commercial Worker (UFCW), was widely recognized as of the leading union organizers for the Cannabis industry.  The indictment alleged that Rush received $600,000 in kickbacks from an Oakland dispensary, in exchange for ensuring union endorsements and other favors.  If convicted, Rush could face a sentence of more than 20 years.

103.     Mr. Rush still sits on the Berkeley Medical Cannabis Commission.

### FIRST CAUSE OF ACTION
### Acquisition and Maintenance of an Interest in and Control of
### an *Enterprise* Engaged in a *Pattern of Racketeering Activity*:
### 18 U.S.C. §§ 1961, 1962

104.     Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.  Substance prevails over form.

105.     At various times and places described herein, all Defendants did acquire and/or maintain, directly or indirectly, an interest in or control of a RICO *enterprise* of individuals who were associated in fact and who did engage in, and whose activities did affect, the possession with intent to distribute for profit, the distribution for profit, the transportation for profit and the sale for profit of a controlled substance chargeable under California law and punishable by imprisonment for more than one year, all in violation of 18 U.S.C. §§ 1961 and 1962.

106.     During the ten (10) calendar years preceding September 3, 2015 all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961, and did so in violation of the RICO law at 18 U.S.C. 1962(b) (Prohibited activities).

107.    Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U.S.C. 1962(b) *supra*.

108.    Pursuant to the original Statutes at Large, the RICO laws itemized above are to be *liberally* construed by this honorable Court.  Said construction rule was never codified in Title 18 of the United States Code, however.  See 84 Stat. 947, Sec. 904, Oct. 15, 1970.

109.    *Respondeat superior* (principal is liable for agents' misconduct: knowledge of, participation in, and benefit from a RICO enterprise), under 18 U.S.C. 1962(c).

## SECOND CAUSE OF ATION
### Conduct and Participation in a RICO *Enterprise* through a *Pattern of Racketeering Activity*: 18 U.S.C. §§ 1961, 1962

110.    Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.  Substance prevails over form.

111.    At various times and places described herein, all Defendants did associate with a RICO *enterprise* of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

112.    Likewise, all Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO *enterprise* through a *pattern of racketeering activity*, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

113.    During the ten (10) calendar years preceding September 3, 2015., all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961, and did so in violation of the RICO law at 18 U.S.C. 1962.

114.    Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U.S.C. 1962(c) *supra*.

115.    *Respondeat superior* (as explained above).

**THIRD CAUSE OF ACTION**
**Conspiracy to Engage in a *Pattern of Racketeering Activity*:**
**18 U.S.C. §§ 1961, 1962**

116.   Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.  Substance prevails over form.

117.   At various times and places described herein, all Defendants did conspire to acquire and maintain an interest in a RICO *enterprise* engaged in a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(c) and (d).

118.   At various times and places described herein, all Defendants did also conspire to conduct and participate in said RICO *enterprise* through a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(c) and (d).

119.   During the ten (10) calendar years preceding September 3, 2015., all Defendants did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d).

120.   Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of 18 U.S.C. 1962(d) (Prohibited activities *supra*)

121.   *Respondeat superior* (as explained above).

**PRAYER FOR RELIEF**

WHEREFORE, Petitioners and Plaintiffs pray for the following relief:

1.   For a declaration that the illegal for-profit marijuana operations, Berkeley Patients Group ("BPG"), Berkeley Patients Care Collective, dba for Community Flavor LLC ("BPCC"), and Cannabis Buyers Club of Berkeley ("CBCB"), are not "authorized dispensaries" under California or Berkeley law.

2.   That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from acquiring or maintaining, whether directly

//

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

or indirectly, any interest in or control of any RICO enterprise of persons, or of other individuals associated in fact, who are engaged in, or whose activities do affect, interstate or foreign commerce.

3. That all Defendants and all of their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise alleged in the Complaint.

4. That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering activity in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s).

5. That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof.

6. That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof.

7. That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(b), according to the best available proof.

8. That all Defendants pay to Plaintiff His costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non judicial enforcement and all reasonable counsel's fees and costs; and

9. For such other relief as the Court deems just and proper.

Dated: September 16, 2015          Respectfully submitted,

                           LAW OFFICES OF WHITNEY LEIGH

                           By: */s/ G. Whitney Leigh*
                              G. Whitney Leigh
                              Attorneys for Plaintiff
                              CHRISTOPHER SMITH

1

## <u>DEMAND FOR JURY TRIAL</u>

2      Plaintiff CHRISTOPHER SMITH hereby demands trial by jury on the claims raised herein.

3  Dated:  September 16, 2015                    Respectfully submitted,

4                                               LAW OFFICES OF WHITNEY LEIGH

5

6                                               By:__/s/ G. Whitney Leigh_____ _____
                                                  G. Whitney Leigh
7                                                 Attorneys for Plaintiff
                                                  CHRISTOPHER SMITH
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**VERIFICATION**

2

      I, Christopher Smith, declare as follows:

3

      I have read the foregoing ***VERIFIED* COMPLAINT FOR DECLARATORY AND**

4

**INJUNCTIVE RELIEF AND DAMAGES FROM RACKETEERING, CONSPIRACY TO**

5

**ENGAGE IN A PATTERN OF RACKATEERING ACTIVITY** and know its contents.  I am

6

informed and believe that the matters stated therein are true and on that ground and declare under

7

penalty of perjury under the laws of the State of California that the same are true and correct.

8

      I declare under the penalty of perjury under the laws of the State of California that the

9

foregoing is true and correct.  Executed on September 16, 2015, in Berkeley, California.

10

11

12

          */s/ Christopher Smith*
          CHRISTOPHER SMITH

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28